**MOUNT EVANS COMPANY, a Colorado corporation; Mount Evans Company (II), a Colorado corporation; Clear Creek County, Clear Creek County, Colorado, Plaintiffs–Appellants,**

v.

**Edward R. MADIGAN, Secretary, United States Department of Agriculture; F. Dale Robertson, Chief, U.S. Forest Service; Gary Cargill, Regional Forester; United States Department of Agriculture, named as "United States Department of Agriculture Forest Service," Defendants–Appellees.**

**Sierra Club, Amicus Curiae.**

**No. 92–1251.**

United States Court of Appeals, Tenth Circuit.

Jan. 20, 1994.

Joanne Herlihy (William Perry Pendley with her on the brief), of Mountain States Legal Foundation, Denver, CO, for plaintiffs-appellants.

Michael E. Hegarty, Asst. U.S. Atty. (Michael J. Norton, U.S. Atty., with him on the brief), Denver, CO, for defendants-appellees.

Carl G. Stevens, Lakewood, CO, for amicus curiae.

Before BALDOCK, BRIGHT * and McWILLIAMS, Circuit Judges.

BALDOCK, Circuit Judge.

Plaintiffs Mount Evans Companies ("Mount Evans I" and "Mount Evans II") and Clear Creek County ("the County") appeal the district court's order affirming a United States Forest Service ("Forest Service") decision not to rebuild a structure located on Forest Service lands which was destroyed by fire.

---

* The Honorable Myron H. Bright, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

The Crest House was constructed under a Forest Service "term permit" in 1941 at the summit of Mount Evans, Colorado, and was operated for forty-two years by Mount Evans I. The Crest House provided shelter, toilets, first aid, access to medical and rescue teams, and food and souvenir sales for the accommodation of the public visiting the summit of Mount Evans. In 1968, as required by the term permit, Mount Evans I conveyed title to the Crest House to the Forest Service but continued to operate the Crest House under a special use permit. Mount Evans II, which was established by two directors of Mount Evans I in October 1983, is the successor to the interests of Mount Evans I. The Crest House was widely used by Clear Creek County residents and generated revenue to the County through a twenty-five percent revenue sharing program the Forest Service maintains with counties in which Forest Service facilities are located as well as through sales taxes collected by the County from sales at the Crest House.

The Crest House was destroyed by fire on September 1, 1979. The Forest Service received money in settlement of the destruction but on March 1, 1990, after several years and four different decisions, elected not to rebuild the Crest House. On May 27, 1980, the Forest Supervisor issued a Decision Notice ("First Decision Notice"), accompanied by an Environmental Assessment, which recommended reconstruction of the Crest House. Without withdrawing the First Decision Notice and before any action on that notice was implemented, the Regional Forester, in November 1983, requested a new Environmental Assessment so that he could decide whether to rebuild the Crest House. On June 28, 1984, the Regional Forester issued a Decision Notice ("Second Decision Notice"), accompanied by another Environmental Assessment, again recommending replacement of the Crest House. On July 10, 1986, the Regional Forester issued a third Decision Notice ("Third Decision Notice"), this time recommending that the Crest House not be restored and that a non-manned wind shelter and viewing platform be installed. The

Mount Evans Companies appealed the third decision, and the Forest Service withdrew the third decision on October 22, 1986 to reevaluate its decision not to rebuild the Crest House. On March 1, 1990, the Forest Service issued its last Decision Notice ("Fourth Decision Notice"), signed by the Forest Supervisor and accompanied by an Environmental Assessment and Economical Analysis, which recommended installation of an unstaffed viewing platform and information station which incorporated the Crest House ruins. Mount Evans Companies again appealed, thus exhausting their administrative remedies, and their appeal was denied on August 15, 1990.

On April 16, 1991, Plaintiffs filed this action in federal district court. In their complaint, they alleged that the Forest Service violated 16 U.S.C. § 579c by failing to use settlement funds and insurance money received as a result of the fire to restore the Crest House and also alleged that the series of Forest Service decisions culminating in its decision not to restore the Crest House were arbitrary, capricious and not in accordance with law under the Administrative Procedure Act ("APA"),[1] specifically violating 5 U.S.C. § 706(2)(A). On July 1, 1992, the district court granted summary judgment to the Forest Service, stating "[t]he extensive record in this matter provides substantial evidence to support the agency's decision."

### I.

██ The Forest Service first argues that its decision not to rebuild the Crest House is completely discretionary and not subject to judicial review. Because a determination of whether agency action is subject to judicial review under § 701(a)(2) of the APA is a jurisdictional issue, *Sierra Club v. Yeutter,* 911 F.2d 1405, 1421 (10th Cir.1990), we must, as a threshold matter, address whether the Forest Service's actions taken pursuant to 16 U.S.C. § 579c are subject to judicial review. *See Bender v. Clark,* 744 F.2d 1424, 1426 (10th Cir.1984); *Citizens Concerned for Sep-*

---

1. The Administrative Procedure Act is codified at 5 U.S.C. §§ 551–559, 701–706, 1305, 3105, 3344, 4301, 5335, 5362, 7521.

aration of Church and State v. City and County of Denver, 628 F.2d 1289, 1296–97 (10th Cir.1980), cert. denied, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981).

"The [APA] provides that '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof,' 5 U.S.C. § 702, and [the Supreme Court has] read the Act as embodying a 'basic presumption of judicial review.'" Lincoln v. Vigil, —— U.S. ——, ——, 113 S.Ct. 2024, 2030, 124 L.Ed.2d 101 (1993) (quoting Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)). "This is just a presumption, however, and under § 701(a)(2) agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law.'" Id. (quoting 5 U.S.C. § 701(a)(2)). "[Section] 701(a)(2) makes it clear that 'review is not to be had' in those rare circumstances where the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" Id., —— U.S. at ——, 113 S.Ct. at 2030–31 (quoting Heckler v. Chaney, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985)); Webster v. Doe, 486 U.S. 592, 600, 108 S.Ct. 2047, 2052, 100 L.Ed.2d 632 (1988). "In such a case, the statute [ ] can be taken to have committed the decisionmaking to the agency's judgment absolutely," and thus, administrative decisions made pursuant to the statute are precluded from judicial review. Id., —— U.S. at ——, 113 S.Ct. at 2032 (internal quotations omitted).

In its recent decision, Lincoln v. Vigil, the Supreme Court held that the allocation of funds from a lump-sum appropriation statute, when the statute does not restrict what can be done with those funds, is committed to agency discretion and unreviewable under 5 U.S.C. § 701(a)(2). In Sierra Club v. Yeutter, we addressed an expenditure statute, 16 U.S.C. § 526, and concluded that it was unreviewable as it "clearly [was] permissive and fail[ed] to provide the necessary law" to conduct meaningful review. 911 F.2d at 1413. Section 526, the statute at issue in Sierra Club, reads:

There are authorized to be appropriated for expenditure by the Forest Service such sums as may be necessary for the investigation and establishment of water rights including the purchase thereof of lands or interests in lands or rights-of-way for the use and protection of water rights necessary or beneficial in connection with the administration and public use of the national forests.

Sierra Club, 911 F.2d at 1413 (emphasis added) (quoting 16 U.S.C. § 526). We concluded in Sierra Club that "[o]n its face [§ 526] merely authorize[d] appropriations for the Forest Service's use in investigating and establishing water rights" and "d[id] not command the agency to spend monies and certainly impose[d] no duty to actually investigate or establish water rights." Sierra Club, 911 F.2d at 1413. Under the Sierra Club statute, the Forest Service was not required to spend any money at all on water rights because the Forest Service was only required to spend sums as "may be necessary." Id. (emphasis added). Thus, Sierra Club is similar to Vigil in that the statutes in question in both cases did not restrict what the agency could do with its funds. As a result, neither statute is subject to judicial review.

In contrast to the lump-sum appropriations statute in Vigil and the discretionary expenditure statute in Sierra Club, 16 U.S.C. § 579c, upon which Plaintiffs base their cause of action, limits the discretion of the Forest Service. Section 579c reads in relevant part:

Any moneys received by the United States with respect to lands under the administration of the Forest Service ... as a result of a judgment, compromise, or settlement of any claim, involving present or potential damage to lands or improvements, shall be covered into the Treasury and are hereby appropriated and made available until expended to cover the cost to the United States of any improvement, protection, or rehabilitation work on lands under the administration of the Forest Service rendered necessary by the action which led to the forfeiture, judgment, compromise, or settlement: Provided, That any portion of the moneys so received in

excess of the amount expended in performing the work *necessitated* by the action which led to their receipt shall be transferred to miscellaneous receipts.

(emphasis on "provided" in original). Thus, the Forest Service cannot spend the money it receives in settlement on anything it wishes, but must first ensure that *necessary* improvements to the damaged property have been made. This requirement that the Forest Service ensure that "necessary *improvements*" are made is distinguishable from the nonobligatory phrase in the *Sierra Club* statute which merely made available to the Forest Service "*sums* as *may be* necessary," *Sierra Club,* 911 F.2d at 1413 (emphasis added), for its discretionary use. Thus, § 579c is the type of statute described in *Vigil* in which Congress has "circumscribe[d] agency discretion to allocate resources by putting restrictions in the operative statute[]." *Vigil,* —— U.S. at ——, 113 S.Ct. at 2032.

■ In *Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), the Supreme Court distinguished a statute which leaves a decision of what is necessary entirely to agency discretion from one which leaves an agency's decision of what is necessary subject to judicial review. The unreviewable statute in *Webster* allowed termination of a CIA employee whenever the Director "shall *deem* such termination necessary or advisable in the interests of the United States." *Id.* at 600, 108 S.Ct. at 2052 (emphasis in original). The Court distinguished this unreviewable statute from a reviewable statute which would allow termination whenever "the dismissal *is* necessary or advisable to those interests." *Id.* (emphasis in original). In our view, the Court in *Webster* was clearly attempting to differentiate between the *Webster* statute, which used the word "deem" to "exude[ ] deference to the Director," making the statute unreviewable, from a statute such as § 579c, which uses the word necessary without any deference to the Forest Service's determination of what is necessary, making it reviewable. *See* 16 U.S.C. § 579c (appropriating money to cover the cost of "any improvement, protection, or rehabilitation ...

*rendered necessary* by the action which led to the ... settlement" (emphasis added)). Accordingly, the Forest Service's decision that it was unnecessary to rebuild the Crest House, which was made pursuant to § 579c, is not committed entirely to agency discretion and is subject to judicial review.

## II.

■ Having determined that the statute at issue is judicially reviewable, we must now determine whether the parties have standing to sue.[2] Like the determination of whether something is judicially reviewable, a standing determination must be made before jurisdiction is established. *See Citizens Concerned for Separation of Church and State v. City and County of Denver,* 628 F.2d 1289, 1296–97 (10th Cir.1980), *cert. denied,* 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981). Plaintiffs carry the burden of establishing the elements of standing. *Lujan v. Defenders of Wildlife,* —— U.S. at ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

■ "[T]he term 'standing' subsumes a blend of constitutional requirements and prudential considerations." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citing *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)). Article III of the Constitution requires a plaintiff to show: (1) he or she has personally suffered an injury in fact; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, not merely speculative, that the injury will be redressed by a favorable decision. *Defenders of Wildlife,* —— U.S. at ——, 112 S.Ct. at 2136; *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758; *Ash Creek Mining Co. v. Lujan,* 969 F.2d 868 (10th Cir.1992). Beyond the constitutional requirements, a plaintiff must also satisfy the following set of prudential principles: (1) the plaintiff generally must assert his or her own legal rights; (2) the court must refrain from adjudicating "generalized grievances" most appropriately

---

**2.** Defendants raised the issue of standing below in their answer but apparently did not press the issue, and the district court did not address standing in its order.

addressed by one of the other branches of government; and (3) the plaintiff's complaint must fall within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question. *Valley Forge,* 454 U.S. at 474–75, 102 S.Ct. at 759–60; *Bell v. Little Axe Indep. Sch. Dist. No. 70 of Cleveland County,* 766 F.2d 1391, 1398; (10th Cir.1985). We conduct a prudential standing analysis only after Article III standing has been established. *Ash Creek,* 969 F.2d at 876. "'Standing jurisprudence is a highly case-specific endeavor, turning on the precise allegations of the parties seeking relief.'" *Wyoming v. Lujan,* 969 F.2d 877, 882 (10th Cir.1992) (quoting *National Wildlife Fed'n v. Hodel,* 839 F.2d 694, 703–04 (D.C.Cir.1988)).

■ We first hold that the Mount Evans Companies do not have standing because their injuries are not redressable by a favorable decision. Plaintiffs allege that Mount Evans II's injuries are redressable because a favorable decision would require the Forest Service to rebuild the Crest House and allow Mount Evans II the opportunity to compete for the concession contract. This argument fails, however, in light of our recent holding in *Ash Creek Mining Co. v. Lujan,* 969 F.2d 868. In *Ash Creek,* we held that the loss of the possibility of obtaining a federal lease is not redressable by a favorable decision. *Id.* at 874. Mount Evans II's injuries are not redressable because even if Mount Evans II was successful in obtaining the relief it seeks and the Crest House was rebuilt, there is no guarantee that Mount Evans II would be awarded the concession contract, and there is no way this court or any other court could order the Forest Service to award Mount Evans II that contract. As to Mount Evans I, the record before us shows Plaintiffs failed to allege any facts which make its injuries redressable. Furthermore, Mount Evans I would not even be eligible to receive the concession contract in the event the Crest House was rebuilt because Mount Evans I no longer exists. Thus, because both Mount Evans I and II fail to meet their burden of establishing all the elements of standing, *see Defenders of Wildlife,* —— U.S. at ——, 112 S.Ct. at 2136, both Mount Evans Companies lack Article III standing.

■ We next address whether the County has standing and conclude that the County meets all the requirements of Article III standing. The County has been injured by a loss of revenue sharing and sales tax monies, and these injuries are traceable to the Forest Service's decision not to rebuild the Crest House. Furthermore, both injuries would be redressed if we ordered the Crest House rebuilt because the County would again collect a portion of the revenues of the Crest House as well as sales taxes from Crest House sales. It is clear from the record that rebuilding the Crest House would result in the County collecting a portion of the Crest House revenues because the Forest Service admitted in its answer below that it "conducts a program of sharing 25% of the revenues with counties in which [Forest Service] facilities are located," Appellant's App. at 14, and it is undisputed that the County would again collect sales taxes if the Crest House concessions were reopened.

Defendants cite *Wyoming v. Lujan,* 969 F.2d 877 (10th Cir.1992), to contest the County's Article III standing. In *Wyoming v. Lujan,* we held that Wyoming's loss of potential royalty payments was not a redressable injury, because even if Wyoming obtained its requested relief and the court upset the Bureau of Land Management's coal-for-easement exchange, it would still be within the Secretary's discretion whether to allow competitive leasing of the federal coal. *Id.* at 882. Thus, because Wyoming would only receive royalty payments if the coal were open to competitive leasing and because that decision is "vested absolutely" with the agency and not with the judiciary, we held that "[a] favorable ruling ... [would] not guarantee the State one nickel of coal leasing royalties from these lands." *Id.*

The County's situation differs significantly from that of the state in *Wyoming v. Lujan.* Here, the County is guaranteed revenue sharing and sales taxes in the event its requested relief is granted—*i.e.,* in the event the Crest House is rebuilt—because rebuilding and restoring the Crest House necessarily means rebuilding and restoring the facilities which house the Crest House's conces-

sions, which will be run either by the Forest Service or a concessionaire. Thus, regardless of whether the concessions are open to competitive leasing or run by the Forest Service, the County will collect twenty-five percent of the Crest House revenues as well as sales taxes from Crest House sales. Because the County meets the Article III standing requirements, we must now address whether the County meets the prudential requirements of standing. *Ash Creek,* 969 F.2d at 876.

To meet the prudential requirements of standing to sue under the APA, the County "must establish that they have suffered a legal wrong because of the challenged agency action, or are adversely affected or 'aggrieved by agency action within the meaning of a relevant statute,'" *Air Courier Conference of Am. v. American Postal Workers Union, AFL–CIO,* 498 U.S. 517, 523, 111 S.Ct. 913, 917, 112 L.Ed.2d 1125 (1991) (quoting 5 U.S.C. § 702). An aggrieved party is a plaintiff whose injury "'falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis of [the] complaint.'" *See id.* at 523–24, 111 S.Ct. at 917–18 (quoting *Lujan v. National Wildlife Federation,* 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990)). "The essential inquiry is whether Congress intended for a particular class of plaintiffs to be relied upon to challenge agency disregard of the law." *Clarke,* 479 U.S. at 399, 107 S.Ct. at 757. "The zone of interest test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision." *Id.* "In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* "The test is not meant to be especially demanding," and "there need be no indication of congressional purpose to benefit the would-be plaintiff." *Id.* A court must look at both the specific purpose of the statute and the more general purposes of the act in

which the statute is contained to determine whether a plaintiff's injury falls within the zone of interests protected by the statute. *Id.* 479 U.S. at 401, 107 S.Ct. at 758 (court must place statute complained under in the overall context of the act in which statute is contained).

The relevant statute upon which the County bases its cause of action is 16 U.S.C. § 579c. *See supra* part I. From the language of § 579c and upon examining its legislative history, we conclude that the statute's primary purpose is to "facilitate and simplify the work of the Forest Service" and perform a "housekeeping" function. S.Rep. No. 1629, 85th Cong., 2d Sess. (1958), *reprinted in* 1958 U.S.C.C.A.N. 2691, 2691; *see also* 16 U.S.C. § 579c. Congress enacted § 579c to "permit the Forest Service to use the money collected to perform the work" because prior to this section's enactment, "collections [we]re deposited into the Treasury and [we]re not available" to the Forest Service. H.R.Rep. No. 1505, 85th Cong., 2d Sess. (1958), *reprinted in* 1958 U.S.C.C.A.N. 2691, 2696. Further evidence of Congress administrative intent in enacting § 579c is that the section and its accompanying 1958 amendments were entitled "Forest Service— Administration." Amendment to Act of March 4, 1913, Pub.L. No. 85–464, 72 Stat. 216 (1958), *reprinted in* 1958 U.S.C.C.A.N. 258, 258. Additionally, § 579c was part of a 1958 amendment to the Act of March 4, 1913 ("the Act"), which was an appropriations statute for the fiscal year ending June 30, 1914. *See* Act of March 4, 1913, Pub.L. No. 430, 37 Stat. 843 (1913). Thus, § 579c was enacted as an amendment to a general appropriations statute, with its primary purpose to streamline Forest Service operations so that the Forest Service would not have to request money from the Treasury each time it needed to perform work on damaged Forest Service property.

Although § 579c was enacted as part of a "housekeeping" amendment to streamline Forest Service operations, the language of § 579c exudes another purpose—to ensure that the Forest Service makes all *necessary* improvements to the damaged property. *See*

*supra* part I. Thus, we must examine whether the County's alleged injuries fall within the zone of interests protected by § 579c, interests which include the efficient administration of the Forest Service and ensurance that the necessary improvements are made to damaged Forest Service property.

▪ The County claims two injuries as a result of the Forest Service's decision not to rebuild the Crest House. We hold that the first injury, the loss of revenues from its revenue-sharing program with the Forest Service, grants the County standing under § 579c. We begin with the presumption favoring judicial review of agency action under the zone of interest test, *see Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987), and we find nothing within § 579c or its legislative history to preclude such review. Next, we conclude that a plaintiff such as the County—*i.e.*, a plaintiff whose injury is an alleged loss of proceeds from the Crest House revenue sharing program—is the type of plaintiff Congress intended to rely upon to enforce the Forest Service's obligation to ensure that all necessary improvements, protections, and rehabilitations are made to the Crest House property. Because we find that the County has standing as a result of its alleged injury which resulted from its loss of revenue sharing proceeds, we do not address the issue of whether it has standing as a result of its alleged injury from lost sales taxes, and we proceed to the merits.[3] *Watt v. Energy Action Educational Foundation*, 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981) (court should proceed to merits when one plaintiff has standing even if others do not).

### III.

We now address the County's claim that the Forest Service's actions violated 16 U.S.C. § 579c. The County asserts that § 579c mandates that the Forest Service use settlement proceeds to restore the Crest House. We disagree.

· Because § 579c is unambiguous on its face, our inquiry ends there. *See Colorado State Banking Bd. v. Resolution Trust Corp.*, 926 F.2d 931, 936 (10th Cir.1991). The statute, *see supra* part I, clearly directs the Forest Service to spend moneys received in settlement on the *necessary* improvement, protection, or rehabilitation of the damaged property, with the excess placed in a general use fund. Thus, the statute does not mandate the complete restoration of the Crest House but merely instructs the Forest Service to take actions necessary to improve, protect or rehabilitate the damaged property. Section 579c anticipates that the Forest Service may decide not to completely restore and not to invest all of the settlement proceeds in the Crest House in that § 579c provides for placement of any excess in a general use fund. While the expenditure of settlement funds is somewhat restricted under § 579c as the Forest Service cannot neglect necessary improvements to the damaged property and spend the proceeds on an unrelated project, it is not so restricted as to mandate that all settlement proceeds be reinvested to restore the Crest House.

### IV.

 The County's final assertion is that the Forest Service's decision not to rebuild the Crest House was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law in violation of 5 U.S.C. § 706(2)(A). Review under § 706(2)(A) is narrow, and the agency need only demonstrate that it considered relevant factors and alternatives after a full ventilation of issues and that the choice it made was reasonable based on that consideration. *Thomas Brooks Chartered v. Burnett*, 920 F.2d 634, 643 (10th Cir.1990). This Court will not substitute its judgment for the agency's, but instead must uphold the agency if there is a rational basis for the decision. *Id.* "An agency's action will be set aside as unlawful if we are able to discern the agency

---

**3.** To the extent, if any, that the County asserts standing as a parens patriae to bring an action on behalf of its citizens against the federal government, it is well-established that parens patriae suits do not meet the requirements of prudential standing because the County is not asserting its own interests and because the federal government is presumed to represent the County's citizens. *See Wyoming v. Lujan*, 969 F.2d at 882–83.

relied on factors which Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 644. In reviewing the agency's action, we accord the district court's decision no particular deference as our determination is an independent one based on the same administrative record that was before the court below. *Id.* The County asserts seven instances in which the Forest Service acted arbitrarily or capriciously or abused its discretion.

### A.

■ First, the County claims that the Forest Supervisor's options were artificially narrowed because he was authorized to choose only four of six proposed alternatives. Thus, the County claims the Forest Supervisor abused his discretion by failing to submit the decision to one of his superiors in the Forest Service who would be authorized to choose any of the six alternatives. In support of this argument, the County cites *International Ladies' Garment Union v. Donovan,* 722 F.2d 795 (D.C.Cir.1983), in which the D.C. Circuit held that the agency decision maker abused his discretion by failing to address "common and known or otherwise reasonable options," and by failing "to explain any decision to reject such options." *Id.* at 818.

It is clear from the record that the Forest Supervisor considered all six alternatives. Unlike the *Garment Union* case cited by the County in which the agency failed to consider a commonly known and reasonable option, it is clear from the record in this case that all six options were carefully considered and that the Forest Supervisor was free to choose any of the six options, with the proviso that if he chose one of the two beyond his authority as the best option, he would have to submit his recommendation to a higher authority for approval. *See* Appellant's App. at 60, Fourth Environmental Assessment ("Should one of these alternatives [which are beyond the Forest Supervisor's authority] be determined as the most feasible, the Forest Supervisor could not select it until some other action occurs which would give him authority to make the decision, or he would have to refer the decision to the Regional Forester. Should the decision or action be beyond the authority of the Regional Forester, he in turn would have to refer the decision to the Chief of the Forest Service.") Thus, this is not a case where the decision maker's options were artificially narrowed.

### B.

The County next asserts that because the Forest Supervisor failed to address all six options in detail within his decision document, he acted arbitrarily and capriciously. The County again cites *Garment Union* in support of their argument, asserting that the decision maker failed "to explain why [viable] alternatives were not chosen." *Garment Union,* 722 F.2d at 815.

The record unquestionably reflects that the Forest Supervisor addressed every option in turn and gave a detailed explanation of his reasons for rejecting the unselected options. In the first few pages of the Fourth Decision Notice, the Forest Supervisor outlines the six alternatives, *see* Appellant's App. at 41–43, he then carefully explains his reasons for choosing not to restore the Crest House, which directly explains his rejection of three of the options, *see* Appellant's App. at 44, Fourth Decision Notice, and throughout his decision notice he discusses his reasons for retaining the ruins of the Crest House, implicitly giving his reasons for rejecting the remaining two alternatives of allowing the ruins to slowly deteriorate and of removing the ruins. Furthermore, all six alternatives and the Supervisor's reason for rejecting five of them were discussed in greater detail in the Environmental Assessment which was attached to the Fourth Decision Notice. This Environmental Assessment should be considered together with the Fourth Decision Notice as the decision of the Forest Service. *See* 40 C.F.R. § 1506.4 ("Any environmental document in compliance with [the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370d,] may be combined with any other agency docu-

ment to reduce paperwork"); *see also* 42 U.S.C. § 4332 (requiring environmental impact statement under NEPA for major federal actions significantly affecting the quality of the human environment).

## C.

■ Next, the County argues that the Forest Supervisor's decision was arbitrary and capricious as he failed to address in his Fourth Decision Notice comments raised during the appeal of the Third Decision Notice. These comments consisted of five suggested methods for raising funds to rebuild the Crest House, which were: (1) contribution of funds by the concessionaire, (2) assistance from the State of Colorado, (3) converting the road leading to the Crest House to a toll road, (4) allowing the concessionaire to rebuild the Crest House for purchase by the Forest Service in the amount of the settlement proceeds, and (5) a joint venture between Mount Evans Company and the Forest Service to rebuild the Crest House.

While the Fourth Decision Notice specifically addressed only the joint venture option and did not specifically address the other four, it did consider three alternatives for funding, including full private funding, full public funding and a mixture of both. Furthermore, the record indicates that the Forest Supervisor did consider the other four alternatives. *See* Appellant's App. at 57, Environmental Assessment ("[t]he environmental analysis completed for this document reviewed and considered for inclusion ... the comments received as a result of the 7/10/86 Decision Notice"). We therefore conclude that the Forest Supervisor's decision was not arbitrary and capricious for failure to address the comments raised during appeal of the Third Decision Notice.

## D.

■ The County next asserts that the Forest Supervisor's failure to explain, in the Fourth Decision Notice, why the First and Second Decision Notices had been rescinded rendered the fourth decision arbitrary and capricious. The County cites *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77

L.Ed.2d 443 (1983), and *Defenders of Wildlife v. Administrator, EPA,* 688 F.Supp. 1334 (D.Minn.1988), claiming that these cases require a reasoned explanation for the reversal of the previous decisions.

We find these cases distinguishable because they involved a change in agency-wide policy, not a change in a specific decision as to how to resolve an isolated incident. Nevertheless, even if a reasoned explanation for reversal is required, the Forest Supervisor fulfilled this requirement by discussing at length in the Fourth Decision Notice his reasons for not restoring the Crest House. This discussion is enough to qualify as a reasoned explanation of the rejection of both the first and second decision because both the first and second decisions were decisions to rebuild.

## E.

■ Because the County's fifth and sixth arguments are related, we address them together. In these arguments, the County asserts that the decision maker relied on flawed data which rendered the decision a clear error in judgment which must be set aside. The data which the County alleges was flawed is an estimate in the Fourth Decision Notice which fixed the number of people visiting the summit of Mount Evans at approximately 80,000 annually, with traffic counts which "have not declined since fire destroyed the Crest House structure in 1979." Appellant's App. at 44, Fourth Decision Notice.

We have reviewed the record and find nothing to support the estimate and nothing to support the Forest Supervisor's determination that traffic counts did not decline following the Crest House fire. While there is one study completed in June 1991 which might support the finding, *see* Appellant's App. at 175–76, this information was not before the Forest Supervisor when he made his decision in March 1990; therefore, this study is irrelevant to our inquiry. *See American Mining Congress v. Thomas,* 772 F.2d 617, 626 (10th Cir.1985) (agency's action must be reviewed on basis agency articulates and on evidence before agency at time it acted),

*cert. denied,* 476 U.S. 1158, 106 S.Ct. 2276, 90 L.Ed.2d 718 (1986). The record contains another study which, instead of supporting, thoroughly contradicts the 80,000–visitor figure and the no-decline determination, *see* Appellant's App. at 90; however, the agency asserts that it rejected this study as unreliable because it only counted visitors during one forty-eight-hour period each year. In support of the visitor estimate, the agency has attached an affidavit to its brief, of which the County does not approve and which was filed as a supplement to the Administrative Record in the district court. In this affidavit, a biological scientist declares that he conducted a study which was "inadvertently not memorialized in this Administrative Record" and was subsequently "misplaced," but was conducted prior to the March 1990 decision and was before the Forest Supervisor at the time of his decision. The scientist reports that in this study, which was conducted in 1985, his staff placed a traffic counter at the Summit Lake gate for the entire season the summit was open and monitored the count closely, recording the numbers often. Even if this study did substantiate the 80,-000–visitor figure for the year 1985, which this court has no way of knowing because we do not have the study, we fail to see how this study would support the conclusion that there were 80,000 visitors annually for the years before and after the fire nor do we see how this study would support the conclusion that the traffic count has not declined in the years since the fire. Even if this study accurately counted the 1985 visitors, there were no reliable studies performed prior to the March 1990 decision that estimated the number of visitors prior to the 1979 fire. Thus, we conclude that the Forest Supervisor's data that approximately 80,000 people visited the summit of Mount Evans annually and his data that traffic counts did not decline after the 1979 Crest House destruction are unsubstantiated by the record.

The conclusion that this data is unsubstantiated does not, however, require reversal of the Forest Supervisor's decision, because the agency relied on a number of findings, not merely the number of visitors to Mount Evans' summit, to reach its decision. "When an agency relies on a number of findings, one or

more of which are erroneous, we must reverse and remand only when there is a significant chance that but for the errors the agency might have reached a different result." *National Parks and Conservation Ass'n v. FAA,* 998 F.2d 1523, 1533 (10th Cir.1993). The other findings made by the Forest Supervisor to support his decision included: (1) "loss of the original Crest House has not detracted from the [ ] natural experience" of visitors to the Crest House; (2) funds received in settlement after the fire are "grossly inadequate" to reconstruct the Crest House; (3) expense of constructing and maintaining the Crest House cannot be justified for the short season during which it would operate and with little annual return to the treasury to justify the investment; (4) preservation of the Crest House ruins and their incorporation into a information/interpretation platform "will preserve the most significant remains of the Crest House for interpretation of its place in the early development of Colorado's tourism industry"; (5) no significant impact on the "human environment," on "public health and safety," or on "the geographic area surrounding the Crest House"; (6) the "existing character" of the Crest House ruins, which are on the National Register of Historic Places, will be "favorably affect[ed]"; (7) no effect on threatened or endangered species or habitat; and (8) no threat or violation of federal, state or local law or requirements imposed for the protection of the environment. Thus, upon review of the numerous supporting findings made by the Supervisor in support of his decision, we cannot say that there is a significant chance that but for the 80,000–visitor and no-decline errors the agency might have reached a different result, and we conclude that the Forest Supervisor had "ample evidence to support [his] decision." *See Committee to Preserve Boomer Lake Park v. Dot,* 4 F.3d 1543, 1553 (10th Cir.1993).

### F.

■ The County finally alleges that because the economic analysis, which accompanied the Fourth Decision Notice, failed to incorporate the settlement and insurance monies, thereby precluding consideration of a

relevant fact, the Forest Supervisor's decision was arbitrary and capricious. Because we find it clear from the record that the Forest Supervisor considered the availability of these monies in reaching his decision, we find no merit in this argument.[4]

**AFFIRMED.**

---

4. Plaintiffs also argue that the district court erred by granting the Sierra Club's motion to file a brief of amicus curiae as a permissive intervenor pursuant to Fed.R.Civ.P. 24(B). In light of our above conclusions, we do not address this argument as it would not affect the outcome of this appeal.