**YANKTON SIOUX TRIBE and Joyce Golus, Plaintiffs,**

**v.**

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES and the United States Indian Health Service, et al., Defendants.**

**Civ. No. 94–4073.**

United States District Court,
D. South Dakota,
Southern Division.

May 5, 1994.

Charles T. Abourezk, James G. Abourezk, Abourezk Law Offices, Rapid City, SD, for plaintiffs.

Craig P. Gaumer, U.S. Attorney's Office, Sioux Falls, SD, for defendants.

## MEMORANDUM OPINION AND ORDER

PIERSOL, District Judge.

Plaintiffs challenge decisions of the Indian Health Service (IHS) to discontinue inpatient and emergency medical services for members of the Yankton Sioux Tribe at the Wagner IHS Health Care Facility. Plaintiffs seek judicial review of these agency decisions under the Administrative Procedures Act (APA), 5 U.S.C. § 702. They also assert Fifth Amendment due process and equal protection claims.

On April 1, the Court issued a temporary restraining order enjoining Defendants from reducing 24–hour emergency room service and terminating the employment of sixteen medical staff employees at the Wagner IHS Health Care Facility. The Court expedited this matter on its calendar and held a bench trial on Thursday and Friday, April 28 & 29, 1994. The Court received and considered the brief amici curiae of the Rosebud Sioux Tribe and the Santee Sioux Tribe of Nebraska. At the close of the evidence and after hearing arguments of counsel, the Court ruled from the bench and will now more fully explain its oral rulings.

### Findings of Fact

The Snyder Act of 1921, 25 U.S.C. § 13, and the Indian Health Care Improvement Act of 1976, 25 U.S.C. §§ 1601–1682, comprise the legislative authority for health care programs and facilities that are administered by the Indian Health Service (IHS), an agency of the Public Health Service within the Department of Health and Human Services. The Wagner IHS Hospital was built in 1937 and by 1981 was listed as number four on the IHS Health Facilities Construction Priority List. In 1982, the General Accounting Office (GAO) issued a report suggesting that IHS should re-evaluate inpatient services at nine locations. As a result of the report, IHS developed a guideline limiting replacement inpatient facilities to those expected to have an average daily patient load (ADPL) of fifteen. IHS did not officially adopt this guideline until 1988 or 1989. At the Wagner IHS facility, however, ADPL was around six, and thus, IHS determined in 1983 that the projected workload did not justify building a replacement facility providing inpatient services.

In fiscal year 1984, Congress appropriated, pursuant to the Indian Health Care Improvement Act, 25 U.S.C. §§ 1601–1682, a lump-sum amount of more than $53 million for IHS construction and renovation projects. (Gov't. ex. B at 4.) According to the testimony, this figure included $360,000 for planning and design of an ambulatory care facility at Wagner, which would provide outpatient and preventative health services. Witnesses testified, and defendants did not dispute, that IHS is obligated to consult with Indian tribes before constructing or renovating health care facilities. During the fiscal year 1985 hearing before the Subcommittee of the Committee on Appropriations of the House of Representatives, Dr. Everett R. Rhoades, Assistant Surgeon General, Director, Indian Health Service, reported that the tribe was not convinced of the value of an outpatient facility and that negotiations toward reaching consensus were ongoing. (Gov't. ex. A, at 2–3.) Upon questioning by the Chairman of the Subcommittee, Mr. Sidney R. Yates, Dr. Rhoades acknowledged that the tribe wanted a hospital, but that IHS believed inpatient care could be purchased on contract at Wagner Community Memorial Hospital.

In July 1986, the Wagner Health Care Facility Program Justification Document (PJD) was approved by Dr. Rhoades; John H. Kelso, Acting Administrator, Health Resources and Services Administration; and Robert E. Windom, M.D., Assistant Secretary for Health. (Pl. ex. 1.) It authorized construction of a new ambulatory care facili-

ty, and provided that inpatient services would be phased out by January 1, 1990, because of the availability of alternative inpatient facilities at the nearby Wagner Community Memorial Hospital and at other regional hospitals, including Sacred Heart Hospital in Yankton, South Dakota. Dr. Richard Olson, Director of Patient Care Professional Affairs in the Office of Health Programs at IHS headquarters, testified that 24–hour emergency room services were to be phased out at the Wagner IHS facility, along with the inpatient services. The PJD also provided for certain contingencies:

> The IHS Aberdeen Area Office will assure during contract negotiations for inpatient care that the contracting hospital is JCAHO [Joint Commission on Accreditation of Health Care Organizations] accredited and will provide care at least comparable to IHS facilities; grants IHS medical personnel staff privileges; will allow patient care surveillance; and that Indians be appointed to the Board of Directors.

(Pl. ex. 1 at 4.)

Dr. Terry Sloan, former Aberdeen Area Director from November 1984 to March 1992, testified that preparation of a PJD is a complicated process that involves direct negotiation with the tribe. He testified that, by signing the PJD, high-level officials approved of the plan, including the PJD's provision that inpatient services at the Wagner IHS facility would be phased out by January 1, 1990. He further testified it was his understanding that the Wagner IHS inpatient facility could not be closed until the above-quoted contingencies included in the PJD were met. Dr. Olson testified, however, that the contingencies were required to be met during the process of contracting for inpatient services, not before closing the Wagner IHS inpatient facility. In any event, witnesses testified, and the Court finds, that the contingencies have not been met to date. Officials of the Wagner Community Memorial Hospital have not signed a contract to provide inpatient services for tribal patients, although that hospital is providing contract care for tribal members. Inpatient services at the Wagner IHS facility ended on November 16, 1992. Dr. Sloan testified that the Wagner Community Memorial Hospital is not JCAHO accredited, while the Wagner IHS facility was among the top ten hospitals accredited by JCAHO. No Indians have been appointed to the Wagner Community Memorial Hospital Board of Directors, and patient care surveillance is not permitted. Although Wagner Community Memorial Hospital granted IHS physicians staff privileges, the IHS physicians resigned those privileges in protest of Wagner Community's policy that it will not treat tribal members who are suffering from alcohol-related conditions. Vern Donnell, Service Unit Director, testified that forty percent of patients treated by Wagner IHS have a history of alcoholism.

The evidence indicates that in 1983 the IHS Aberdeen Area Office notified Mr. Leonard Hare, Jr., Chairman of the Health Board of the Yankton Sioux Tribe, that IHS intended to build an ambulatory care facility and phase out the existing inpatient services at the Wagner IHS hospital. Dr. Sloan, Dr. Olson, and Vern Donnell all testified that IHS administrators participated in meetings with officials of the tribe and the Wagner Community Memorial Hospital regarding discontinuation of inpatient services at the Wagner IHS facility. Dr. Sloan testified, however, that he did not give the tribe official notice, nor did he receive an order from his superiors to give the tribe official notice, of closure of the Wagner IHS in-patient facility. He testified that the tribe was aware closure might happen and that the tribe had expressed an interest in exercising self-determination to operate the inpatient facility if IHS planned to close it. Jolene Arrow, Secretary of the Tribal Council, testified that the tribe did not receive notice of the discontinuance of inpatient services and that, based upon information from Vern Donnell, Service Unit Director, the tribe thought the closure was temporary because of heating and ventilation concerns. Darlene Williamson testified that she received notice the same day the inpatient facility closed. The parties stipulated at trial that IHS did not provide Yankton Sioux tribal members with individual notice that inpatient services and 24–hour emergency room services would be discontinued at the Wagner IHS facility. The parties

also stipulated that IHS did not provide Yankton Sioux tribal members with individual hearings relating to the discontinuance of these services.

In September 1988, for fiscal year 1989, Congress appropriated, again pursuant to the Indian Health Care Improvement Act, 25 U.S.C. §§ 1601–1682, over $61 million dollars for IHS construction projects, $4,227,000 of which was earmarked for the Wagner IHS Health Care Facility. (Gov't. exs. D–F.) Construction of the new portion of the facility began in August 1991. Inpatient services ceased as of November 16, 1992, and the facility has operated since that date as an ambulatory care and emergency facility. The facility as it now exists cannot support inpatient services. (Gov't. ex. I.) Dr. Olson testified that the IHS administers 49 hospitals, 150 health centers, and 350 other part-time or intermittent health centers, but IHS does not provide each tribe with similar services. He testified that the level of services provided depends upon workload, including a consideration of ADPL, the location and accessibility of alternative medical services, and the ability to recruit and retain quality professionals.

Effective November 23, 1988, Congress enacted Public Law 100–713, Indian Health Care Amendments of 1988, which substantially altered and added to the provisions of 25 U.S.C. § 1631. In addition to its previous direction to consult with Indian tribes regarding planned construction or renovation of health care facilities, Congress added the following:

**(b) Closure; report on proposed closure**

(1) Notwithstanding any provision of law other than this subsection, no Service hospital or outpatient health care facility of the Service, or any portion of such a hospital or facility, may be closed if the Secretary has not submitted to the Congress at least 1 year prior to the date such hospital or facility (or portion thereof) is proposed to be closed an evaluation of the impact of such proposed closure which specifies, in addition to other considerations—

(A) the accessibility of alternative health care resources for the population served by such hospital or facility;

(B) the cost effectiveness of such closure;

(C) the quality of health care to be provided to the population served by such hospital or facility after such closure;

(D) the availability of contract health care funds to maintain existing levels of service;

(E) the views of the Indian tribes served by such hospital or facility concerning such closure.

(2) Paragraph (1) shall not apply to any temporary closure of a facility or of any portion of a facility if such closure is necessary for medical, environmental, or safety reasons.[1]

Dr. Olson testified that, because he thought amended section 1631(b)(1) applied to the Wagner IHS facility, he directed Reba Walker, Aberdeen Area Associate Director since March 1992, to prepare a Draft Impact Study pursuant to the statute. Ms. Walker testified that it was usual practice to prepare for any eventuality that might occur, and she directed a member of her staff, Sandy Coulter, to prepare the Draft Impact Study. Ms. Coulter testified that the draft concluded it would be more cost-effective to provide inpatient services directly to tribal members, assuming that the tribe built the facility, rather than to obtain such services through contract care. The draft study did not include the costs of new inpatient construction or staffing. According to Ms. Walker, the draft never became a finalized, signed document adopted by the agency. Both she and Dr. Olson testified that the efforts to produce the document ended when, in September 1993, then Director of the Indian Health Service, Michael Lincoln, stated in a letter to Plaintiffs' counsel that section 1631(b)(1) does not apply to the Wagner IHS facility because

---

1. Effective October 29, 1992, Congress enacted Public Law 102–573, amending section 1631(b)(1) to add the following subsections:

(F) the level of utilization of such hospital or facility by all eligible Indians; and

(G) the distance between such hospital or facility and the nearest operating Service hospital.

that facility's PJD became final in 1986, before passage of the statutory amendment.

Mr. Jerome DeWolf, a staff member of the Aberdeen Area Office for four years, testified that, in the summer of 1991, he received a directive from IHS Headquarters to analyze the cost-effectiveness of six hospitals in the Aberdeen Area, using fiscal year 1990 data. He testified that he was directed to replicate a 1982 New Mexico study, but the methodology used in the Aberdeen study ultimately differed because pass-through costs were added. The study concluded that it would be more cost-effective to operate all six hospitals rather than to contract for service. He also testified that the ADPL policy had its origins in the early 1980's, but the policy was not given full effect until 1988–89. There was concern as to how the low-ADPL policy would affect the Aberdeen area; testimony reveals that low-ADPL hospitals at Rosebud and at Winnebago, Nebraska, were not closed, while the Wagner inpatient facility was closed. Dr. Olson testified, however, that the Rosebud facility was not closed because of its remote location as it lies 170 miles from Pierre or Rapid City.

Although IHS officials planned to phase out 24–hour emergency room services along with inpatient services, evidence reveals that the Wagner IHS Health Care Facility has continued to provide emergency room services as it had for many years. Darlene Williamson testified that the loss of inpatient services resulted in a corresponding loss of Medicare and Medicaid funding so that the Wagner facility is currently running at a minimum $400,000 deficit. She testified that, as a result of this deficit, IHS officials planned to eliminate 24–hour emergency room services and terminate the positions of sixteen medical staff personnel. Additionally, she testified that, on a monthly average, the IHS facility handles 500 emergency room visits, while the Wagner Community Memorial Hospital handles two emergency room visits, and thus, the local hospital cannot accommodate tribal needs. She also testified that the loss of health services at the Wagner IHS facility has caused hardship on tribal members who lack transportation and exacerbates problems rooted in cultural differences. Mr. Darryl Drapeau, Yankton Sioux Tribal Chairman, testified that he has received reports by tribal members of racial mistreatment at the Wagner Community Memorial Hospital, but he did not discuss these reports with hospital officials or report them to the State Medical Board. Mr. Vern Donnell testified, however, that IHS pays for Category I (life threatening) emergency room care provided to tribal members at Wagner Community Memorial Hospital and other regional hospitals.

### Judicial Review

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The Supreme Court has read the APA as embodying a "basic presumption of judicial review." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). However, the Supreme Court has again recently made clear that, under 5 U.S.C. § 701(a)(2), agency action is not subject to judicial review " 'to the extent that' " such action " 'is committed to agency discretion by law.' " *Lincoln v. Vigil*, — U.S. ——, ——, ——, 113 S.Ct. 2024, 2027, 2030, 124 L.Ed.2d 101 (1993). Thus, the Court must determine whether the decisions of the IHS at issue here are judicially reviewable.

In *Lincoln*, the Supreme Court held that the decision by the IHS to discontinue the Indian Children's Program for handicapped children in the Southwest was not subject to judicial review under the APA because the decision was committed to agency discretion by law. *Id.* at ——, 113 S.Ct. at 2027. Although the IHS repeatedly apprised Congress of the continuing operation of the program, IHS supported the program with funds from its annual lump-sum appropriation; Congress never expressly appropriated funds for the program. *Id.* at —— —— ——, 113 S.Ct. at 2028–29. The Supreme Court reasoned that the allocation of funds from a lump-sum appropriation is an "administrative decision traditionally regarded as committed to agency discretion," *id.* at ——,

113 S.Ct. at 2031, and so long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, the APA gives the courts "no leave to intrude." *Id.* at ——, 113 S.Ct. at 2032. Where Congress appropriates lump-sum amounts without restricting statutorily what can be done with the funds, a clear inference arises that Congress does not intend to impose legally binding restrictions. *Id.* at ——, 113 S.Ct. at 2031.

The Court finds that *Lincoln* is distinguishable from the case at bar. Contrary to *Lincoln*, Congress specifically appropriated funds for construction and renovation of the Wagner IHS Health Care Facility. More importantly, Congress placed statutory conditions upon the expenditure of the construction funds by IHS. The Indian Health Care Improvement Act of 1976 included a provision codified at 25 U.S.C. § 1631, which provided:

**(c) Consultation with Indian tribes; standards**

Prior to the expenditure of, or the making of any firm commitment to expend, any funds authorized in subsection (a) of this section, the Secretary, acting through the Service shall—

(1) consult with any Indian tribe to be significantly affected by any such expenditure for the purpose of determining and, wherever practicable, honoring tribal preferences concerning the size, location, type, and other characteristics of any facility on which such expenditure is to be made; and

(2) be assured that, wherever practicable, such facility, not later than one year after its construction or renovation, shall meet the standards of the Joint Committee on Accreditation of Hospitals.

Because Congress imposed these statutory conditions on the expenditure of funds, the Court concludes that *Lincoln v. Vigil* is distinguishable. The Court finds that it may judicially review the IHS decision to renovate the Wagner IHS Health Care Facility, which resulted in the elimination of inpatient medical services and the threatened termination of 24–hour emergency room services

and a reduction in medical staff. *See Mount Evans Co. v. Madigan,* 14 F.3d 1444, 1449 (10th Cir.1994) (distinguishing *Lincoln v. Vigil* on the ground that Congress statutorily limited the discretion of the Forest Service in expending funds). .

*Statutory Construction of 25 U.S.C. § 1631(b)(1)*

■ "[S]tandard principles of statutory construction do not have their usual force in cases involving Indian law." *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985). The canons of construction applicable are "rooted in the unique trust relationship between the United States and the Indians." *Oneida County v. Oneida Indian Nation,* 470 U.S. 226, 247, 105 S.Ct. 1245, 1258, 84 L.Ed.2d 169 (1985). The Court must construe section 1631(b)(1) liberally in favor of the tribe and interpret ambiguous provisions to the tribe's benefit. *See Hagen v. Utah,* —— U.S. ——, ——, 114 S.Ct. 958, 965, 127 L.Ed.2d 252 (1994); *South Dakota v. Bourland,* —— U.S. ——, ——, 113 S.Ct. 2309, 2316, 124 L.Ed.2d 606 (1993); *Sisseton–Wahpeton Sioux Tribe v. United States,* 16 F.3d 261, 264 (8th Cir.1994).

■ Congress clearly provided in section 1631(b)(1) that, "[n]otwithstanding any provision of law other than this subsection, no Service hospital or outpatient health care facility of the Service, or any portion of such a hospital or facility, may be closed if the Secretary has not submitted to the Congress . . . an evaluation of the impact of such proposed closure[.]" The explicit statutory language leaves no doubt that Congress intended to require IHS to report to Congress regarding the impact of proposed closures of its health facilities. What is not clear is to what extent, if at all, Congress intended the reporting statute to apply to proposed closures and renovations already in progress— those, like the case at bar, for which a PJD had been adopted and Congress had appropriated funds for design and construction. Dr. Olson testified that IHS has not proposed closure of any other IHS facility since enactment of amended section 1631(b)(1) and

therefore, no report has been submitted to Congress under this statute.

The statute provides only that the report must be filed "at least 1 year prior to the date such hospital or facility (or portion thereof) is proposed to be closed[.]" The statute is silent, and therefore ambiguous, as to whether it applies to all proposed closures or to only those closures proposed by IHS after the effective date of the statute.

The legislative history of the statute does not expressly address this ambiguity, but statements within the Senate Report establish that Congress was concerned about the status of Indian health care. S.Rep. No. 508, 100th Cong., 2d Sess. (1988), *reprinted in* 1988 U.S.Code Cong. & Admin.News 6183. The Senate Report confirmed the commitment of Congress to continue to provide Indian tribes with health care services and particularly noted that "the mission of the IHS, in carrying out the policy established by the Congress in the Indian Health Care Improvement Act, is to raise the health status of American Indians ... to the highest possible level." *Id.* at 6185.

As to the impetus for adopting section 1631(b)(1), the Senate Report specifically states that the Select Committee on Indian Affairs was

> concerned with the practice that has been followed in past years in which IHS facilities have been closed without notice to patients, without adequate preparation to assure that patients are advised of alternative health care providers, and without an evaluation of the impact a proposed closure may be expected to have. Thus, Title III provides that notwithstanding any provision of law other than this subsection of the Act, no IHS hospital or other IHS outpatient health care facility, or any portion of an IHS hospital or facility, may be closed unless the Secretary has submitted to the Congress at least one year prior to the date the hospital, facility, or portion thereof is proposed for closure, an evaluation of the impact of the proposed closure[.]

1988 U.S.Code Cong. & Admin.News at 6198–99. In light of this legislative history, and construing the statute liberally in favor of the tribe, the Court concludes that Congress intended the reporting statute would apply to *all* proposed closures of IHS facilities or portions of such facilities, even though Congress had previously appropriated funds pursuant to an approved PJD.

Congress appropriated the final fiscal year 1989 construction funds for Wagner in September 1988, approximately two months before the effective date of amended section 1631(b)(1). Testimony establishes that the new construction and renovation at Wagner did not begin until August 1991. IHS did not discontinue inpatient services until November 16, 1992. Policy-level IHS officials, who acknowledged at trial their longstanding obligation to consult with Indian tribes regarding construction and renovation of health care facilities, believed that section 1631(b)(1) applied to the Wagner construction. *See Chemehuevi Tribe of Indians v. Federal Power Comm'n*, 420 U.S. 395, 409–10, 95 S.Ct. 1066, 1075, 43 L.Ed.2d 279 (1975) ("a longstanding, uniform construction [of a statute] by the agency charged with administration of [the statute], particularly when it involves a contemporaneous construction of [the statute] by the officials charged with the responsibility of setting its machinery in motion, is entitled to great respect.") In furtherance of its own view of the applicability of the statute, IHS prepared a Draft Impact Study for submission to Congress, yet the process ended when the former IHS Director stated in a letter to Plaintiffs' counsel that he did not think section 1631(b)(1) applied.

■ IHS officials could have, and should have, complied with section 1631(b)(1) as it existed after the 1988 Indian Health Care Amendments, by submitting a written report to Congress one year prior to the date of the proposed closure of inpatient services at the Wagner IHS facility. The Court will require IHS officials to provide Congress with the appropriate report, even though IHS has now terminated inpatient services at the facility. The Court lacks authority to order Congress to appropriate funds to reopen the inpatient facility. The Court expresses no opinion as to whether the termination of inpatient services was an appropriate agency action, but defers to Congress to decide if

additional funds should be appropriated to re-establish an inpatient facility at Wagner.

 For similar reasons, the Court also concludes that IHS officials must comply with section 1631(b)(1) as it currently exists before discontinuing 24–hour emergency room services at the renovated Wagner IHS Health Care Facility because emergency room services are a "portion of such ... facility" to which the statute applies.

### Constitutional Claims

"A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 445, 108 S.Ct. 1319, 1323, 99 L.Ed.2d 534 (1988). The Court observed at oral argument, and the parties agreed, that the Court would not need to reach the constitutional issues if the Court were to find for Plaintiffs on statutory grounds, as the Court has now done. Therefore, the Court declines to rule on the constitutional issues presented.

Accordingly, IT IS HEREBY ORDERED that Plaintiffs are entitled to a declaratory judgment that Defendants failed to satisfy the requirements of 25 U.S.C. § 1631(b)(1) before closing inpatient services at the Wagner IHS Health Care Facility.

IT IS FURTHER ORDERED that a writ of mandamus is granted, pursuant to 28 U.S.C. § 1361, directing those defendants who are officers of the United States to comply with the provisions of 25 U.S.C. § 1631(b)(1) by submitting a written report to Congress regarding the discontinuation of inpatient services and the proposed termination of 24–hour emergency room services at the Wagner IHS Health Care Facility.

IT IS FURTHER ORDERED that a permanent injunction is imposed enjoining the defendant officers of the United States from terminating 24–hour emergency room services now available at the Wagner IHS Health Care Facility until the written report required by 25 U.S.C. § 1631(b)(1) has been submitted to Congress and Congress has either taken final action upon such report or one year has elapsed from the date the report is submitted to Congress, whichever shall first occur.

IT IS FURTHER ORDERED that costs are assessed against Defendants pursuant to 28 U.S.C. § 2412.

