18 F.3d 1492
 The BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF ADAMS;
Front Range Airport Authority; Lloyd Equities, doing
business as Centerport International, Inc.; and United
Parcel Service, Inc., Petitioners,
v.
Frederick M. ISAAC, Regional Administrator, Northwest
Mountain Region, Federal Aviation Administration; Federal
Aviation Administration, an agency of the United States;
Administrator, Federal Aviation Administration; Secretary,
United States Department of Transportation; and Department
of Transportation, an agency of the United States, Respondents.
 No. 93-9505.
 United States Court of Appeals,
Tenth Circuit.
 March 16, 1994.
 
 David H. Wollins (Michael A. Zahorik, McGeady Weston Sisneros & Wollins, Denver, CO; and Robert J. Loew, Adams County Atty., Brighton, CO, with him on the briefs), McGeady Weston Sisneros & Wollins, Denver, CO, for petitioners.
 Peter R. Steenland, Jr. (Myles, E. Flint, Acting Asst. Atty. Gen., and Andrea Nervi Ward, Dept. of Justice; Daphne A. Fuller, Office of Chief Counsel, Federal Aviation Admin., and Karl B. Lewis, Office of Asst. Chief Counsel, FAA Northwest Mountain Region, with him on the briefs), Dept. of Justice, Washington, DC, for respondents.
 Before MOORE, Circuit Judge, McWILLIAMS, Senior Circuit Judge, and COOK, Senior District Judge.*
 JOHN P. MOORE, Circuit Judge.
 
 
 1
 This petition for review centers on whether the Federal Aviation Administration acted arbitrarily and capriciously in reversing a decision to approve and partially fund the construction of facilities for a major air cargo hub at the Front Range Airport, a general aviation facility in the Denver metropolitan area. Upon review, we conclude substantial evidence supports the agency's determination, and the FAA did not act as accused. We therefore affirm.
 
 
 2
 With the prospective closing of Denver's Stapleton International Airport, cargo carriers operating there needed a new location to continue their businesses. Many carriers found Denver's plans for Stapleton's replacement, Denver International Airport (DIA), undesirable because they located cargo operations at the airport's northern end. Carriers contended that site did not provide them ready access to interstate highways.
 
 
 3
 Seeing the need for an alternative to DIA, Adams County, the Front Range Airport Authority (Airport Authority), and Centerport International, Inc. submitted to the FAA, in 1991, a proposal to expand the existing general aviation facility, Front Range Airport (Front Range), into an air cargo hub. Adams County borders the City and County of Denver, and DIA and Front Range are relatively close.
 
 
 4
 In March 1992, in its Record of Decision (ROD), the FAA approved the Front Range expansion to accommodate sizable air cargo traffic anticipated in the Denver metropolitan area. The FAA assumed the absence of this expansion would leave unattended the needs of air cargo carriers because of Stapleton's closing and the carriers' rejection of DIA's northern air cargo site.
 
 
 5
 Later that month, the FAA issued a funding letter informing the parties the agency would allocate $15 million under the Airport Improvement Program to Adams County and the Airport Authority for fiscal year 1992 "subject to revision after bids have been opened; and ... subject to signed leases with the air cargo carriers." The letter expressed no commitment, however, to provide funds beyond 1992 and conditioned an intention to supply fiscal 1993 funding upon the enactment of "new legislation."
 
 
 6
 On the basis of these FAA documents, the Airport Authority expended funds to begin the expansion and to solicit cargo carriers. At least one carrier signed a long-term agreement with Centerport to lease property adjacent to Front Range; one company which provides support services paid the Airport Authority for a twelve-month lease option; and others expressed interest in Front Range Airport if the FAA provided funding. Through letters and meetings, the Airport Authority kept the FAA informed of its progress and submitted formal applications for funding.
 
 
 7
 In August 1992, Denver decided to change its plans and applied to the FAA for approval of cargo facilities on the southern end of DIA. In response, Federal Express, abandoning its earlier preference for Front Range, and Airborne Express entered long-term leases with DIA. In the meantime, "signed leases" between the Airport Authority and air freight carriers, upon which the FAA had predicated its original ROD, never materialized.[1]
 
 
 8
 In November 1992, the regional administrator of the FAA issued an order withdrawing the March ROD and FAA approval of the Front Range project. The order stated, in part:
 
 
 9
 Since issuance of the ROD eight months ago, circumstances have changed considerably, drawing into question the purpose and need for the [Front Range] expansion project and eliminating much of the uncertainty regarding the viability of DIA as an alternative for air carrier cargo operations. Recently several of the major cargo carriers that previously had made tentative commitments to locate their base of operations at [Front Range], made new tentative commitments to base their operations at DIA. These commitments were contingent upon relocation of the areas on DIA currently designated for cargo operations from the north to the south side of the airport.
 
 
 10
 The order set forth other changed circumstances, the "willingness of cargo carriers to relocate to DIA" and Denver's willingness to accommodate the needs of the carriers. The regional administrator concluded the changed circumstances were significant and "supersede[d]" the previously perceived need for the Front Range expansion.
 
 
 11
 The following month, the FAA approved DIA's newly-situated cargo facilities. As a matter of judicial notice, we recognize DIA is poised to open with a southern air cargo facility in place.
 
 
 12
 The Board of County Commissioners for Adams County and other interested parties claim this court should void the reversal order and reinstitute funding because the reversal order is not supported by substantial evidence as required by 49 U.S.C. app. Sec. 1486(e) and 5 U.S.C. Sec. 706(2)(E), and because the FAA acted arbitrarily and capriciously in reversing its initial stance as condemned in 5 U.S.C. Sec. 706(2)(A). Petitioners also raise a conflict claim to justify the reinstatement of the original ROD and contend the FAA should be estopped from denying the money it initially promised.
 
 I.
 
 13
 The Airport Authority, Adams County, Centerport, and United Parcel Service contend the FAA does not have substantial evidence to support its reversal order as required by 49 U.S.C. App. Sec. 1486(e) and 5 U.S.C. Sec. 706(2)(E). Petitioners argue the FAA did not consider all the evidence it found persuasive in reaching its original decision and failed to show a rational connection between the facts and its conclusions. They assert the FAA ignored the superior attributes of Front Range over cargo facilities on DIA's southern side, including Front Range's proximity to transportation routes, low development and operating costs, and new investment opportunities. Also, the FAA ignored the signed long-term leases and commitments from cargo carriers to locate at Front Range if the FAA provided funding.
 
 
 14
 Petitioners contend the failure to consider these commitments to Front Range and other factors demonstrate the FAA acted arbitrarily and capriciously in violation of 5 U.S.C. Sec. 706(2)(A). The FAA failed to provide enough detail of the relevant factors underlying its reversal decision. Furthermore, they claim, the FAA based its reversal order on irrelevant factors: the willingness of two of the seven largest carriers to locate at DIA and DIA's decision to switch the site of cargo operations to accommodate carriers. Petitioners also argue the FAA chose between Front Range and DIA while earlier it recognized the two would compete for the air cargo business. Contending DIA's decision to move its cargo facilities to the south did not eliminate the need for Front Range, petitioners claim the agency should have chosen Front Range if the FAA believed it was compelled to fund only one cargo facility. Petitioners argue the FAA's asserted reason for choosing DIA over Front Range, DIA's closer proximity to interstate highways, did not overcome the reasons the FAA favored Front Range originally. Moreover, petitioners believe the FAA acted in response to passenger airlines and not cargo carriers, and many cargo operators hastily secured space at DIA because of the uncertainty of federal funding for Front Range after the FAA decided to support DIA's southern cargo facilities. Petitioners fault the FAA for crediting the tentative commitments of cargo carriers to DIA when it would not credit their earlier tentative commitments to Front Range. The FAA played favorites when it should have remained neutral. Therefore, the FAA's decision, according to petitioners, was irrational.
 
 
 15
 The Administrative Procedure Act provides a reviewing court shall
 
 
 16
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
 
 
 17
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or]
 
 
 18
 ....
 
 
 19
 (E) unsupported by substantial evidence
 
 
 20
 ....
 
 
 21
 5 U.S.C. Sec. 706. The standards of review in 5 U.S.C. Sec. 706 are each separate, Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974) (citation omitted), and applicable to an agency's modification of an earlier action. Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 41, 103 S.Ct. 2856, 2865-66, 77 L.Ed.2d 443 (1983). In addition, 49 U.S.C. App. Sec. 1486(e) states the FAA's factual findings are conclusive if supported by "substantial evidence."
 
 
 22
 "Substantial evidence" in 5 U.S.C. Sec. 706(2)(E) means more than a mere scintilla but less than the weight of the evidence and refers to relevant evidence which reasonably supports a conclusion. Foust v. Lujan, 942 F.2d 712, 714 (10th Cir.1991) (citations omitted), cert. denied, --- U.S. ----, 112 S.Ct. 1668, 118 L.Ed.2d 388 (1992). In reviewing factual findings for substantial evidence, this court must consider the entire record including evidence opposing the agency's position. City of Pompano Beach v. FAA, 774 F.2d 1529, 1539 (11th Cir.1985) (citation omitted). The substantial evidence standard in 49 U.S.C. app. Sec. 1486(e) requires an agency to have a rational basis for drawing its conclusions from the facts. Id. at 1540 (citations omitted). Thus, statutory interpretation and the application of law must withstand an arbitrary and capricious standard of review. Id. (citations omitted).
 
 
 23
 The arbitrary and capricious standard of 5 U.S.C. Sec. 706(2)(A) is a narrow standard of review. Bowman, 419 U.S. at 285, 95 S.Ct. at 441-42. This court will determine whether the agency considered all the relevant factors and whether there was clear error of judgment, but may not substitute its own judgment for the agency's. Id. The agency must establish a rational relationship between its factual findings and its conclusion. Id. An agency acted arbitrarily and capriciously if it relied on factors deemed irrelevant by Congress, failed to consider important aspects of the problem, presented an implausible explanation or one contrary to the evidence. Quivira Mining Co. v. United States Nuclear Regulatory Comm'n, 866 F.2d 1246, 1249 (10th Cir.1989) (citation omitted). Moreover, an agency must articulate the grounds for its decision with enough detail to enable the reviewing court to determine whether the agency considered the relevant factors and made a reasonable choice. City of Gillette, Wyo. v. FERC, 737 F.2d 883, 886 (10th Cir.1984) (citations omitted). An agency's interpretation of its own regulation is not entitled to great deference if it is based on general common law principles rather than the agency's expertise or if the interpretation contradicts the controlling statute. Edwards v. Califano, 619 F.2d 865, 869 (10th Cir.1980) (citations omitted). Furthermore, this court will not defer to irrational agency judgments. National Parks and Conservation Ass'n v. FAA, 998 F.2d 1523, 1533 (10th Cir.1993).
 
 
 24
 Our review of the record indicates the keystone upon which the ROD was built is the assumption DIA was not a viable alternative to the expansion of Front Range because of the original northern location of the DIA air cargo facility. Indeed, the order stated: "A major uncertainty exists today concerning the implementation of adequate groundside and ground transportation connections at DIA." Other considerations, however, contributed to the ultimate decision. For example, the report referred to "long taxi distances" at DIA that might require "dual deicing for aircraft" adding to the costs of "time-sensitive operations." Additionally, the potential of higher landing fees and the lack of "competitively priced" land for private development were considered to disfavor DIA. Thus, the FAA concluded, "the DIA alternative is not as economical, efficient, and air cargo-oriented as Front Range Airport, and eliminated this alternative from further consideration and evaluation."
 
 
 25
 About two months after the entry of the ROD, the Denver Air Cargo Association and the major airlines serving Denver urged the city to relocate DIA's air cargo facility to the southern end of the site. A letter written by the president of the Denver Air Cargo Association stated:
 
 
 26
 On behalf of the DACA membership in particular and the air cargo customer in general, I implore you to direct the Airport Planning Group to weigh the convenience and economic advantages offered to air cargo users/providers with a southern location of the DIA cargo complex versus the planned northern location. We have an opportunity to make DIA a truly unique major airport by offering the customer and airlines a centralized "cargo city" concept.... We feel strongly that "politics" should be removed from the decision making process and let logic and user/provider needs be the primary basis for the location decision.
 
 
 27
 These suggestions were later followed by letters from Emery Worldwide Airlines, Federal Express, and Airborne Express, stating their desire to locate operations at the southern end of the DIA site. Additionally, United Parcel Service expressed its interest in considering operations at DIA if DIA made a "firm commitment" to a southern cargo area.
 
 
 28
 Although, as petitioners assert, certain cargo carriers indicated various degrees of support for the Front Range project, it is equally evident they made a strong effort to convince Denver to relocate its cargo site. Denver's subsequent rearrangement of DIA in response to these activities provided the FAA with a significant and substantial factor to consider in determining the ultimate location of a metropolitan Denver air cargo hub.
 
 
 29
 Despite the advantages petitioners see in their site, the record demonstrates the substantial majority of cargo carriers galvanized around DIA's southern site and focused the FAA on the change in economic circumstances after the agency originally issued the ROD. The FAA had to consider how to weigh the overall economic viability of DIA's southern cargo site with the other factors mentioned in the ROD.
 
 
 30
 Even in the presence of these other factors, the economic inviability of the northern DIA site was the principle reason why the agency originally rejected DIA as an alternative to Front Range's expansion. Therefore, a change in DIA's economic viability resulting from a switch in its cargo location can reasonably lead to a different conclusion about the approval of the Front Range project. We cannot say the ultimate conclusion was arbitrary and capricious. Moreover, we cannot substitute our judgment of the relative importance of the myriad of factors for that of the agency. Thus, given our limited authority, we see no basis for reversing the withdrawal of the ROD.
 
 II.
 
 31
 The FAA's decision to withdraw its tentative funding is not reviewable. The Administrative Procedure Act prohibits judicial review of an agency action committed to the agency's discretion by law. 5 U.S.C. Sec. 701(a)(2). The Supreme Court has interpreted this exception to mean no judicial review where the statute provides no meaningful standard to judge the agency's action. Heckler v. Chaney, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). The allocation of funds from a lump-sum appropriation is traditionally regarded as committed to agency discretion. Lincoln v. Vigil, --- U.S. ----, ----, 113 S.Ct. 2024, 2031, 124 L.Ed.2d 101 (1993). Congress may limit agency discretion to allocate resources by placing restrictions in the operative statutes. Id. --- U.S. at ----, 113 S.Ct. at 2032. As long as an agency's allocation of a lump-sum appropriation meets permissible statutory objectives, a court has no jurisdiction to review that disbursement. Id.
 
 
 32
 The Airport Improvement Program, 49 U.S.C. app. Sec. 2204, pursuant to which the FAA tentatively agreed to fund Front Range's expansion, provides no guidelines relevant to this controversy. However, 49 U.S.C. app. Sec. 1349 prohibits the expenditure of federal funds for an airport facility unless it "is reasonably necessary for use in air commerce." The statute does not define that phrase, and the parties have not pointed us toward any regulations providing an explanation. "Reasonably necessary for air commerce" does not provide the court with a justiciable standard of review. That kind of determination is better suited to an administrative agency.
 
 III.
 
 33
 Petitioners argue the FAA should be estopped from reversing its original funding decision because the elements of equitable estoppel have been satisfied. FAA employees acting within the scope of their authority outlined the conditions precedent to federal funding of the expansion project which petitioners satisfied. Also, the FAA has promoted private-public initiatives to fund transportation facilities like the Front Range project. The FAA intended petitioners to rely on the funding letter, and petitioners did not know the FAA would withdraw from the Front Range project if DIA moved its cargo facilities to the south. As proof of that, petitioners continued to work with the FAA after DIA decided to relocate the cargo area. Petitioners relied on the agency's representations to its detriment by expending time, money and resources to fulfill the requirements necessary to obtain federal funding.
 
 
 34
 Even though we are sensitive to petitioners' predicament, the government may not be estopped on the same terms as other litigants. Heckler v. Community Health Servs. of Crawford County, Inc., 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). Estoppel may be appropriate where an individual's interest in honorable, reliable dealings with the government outweighs the government's interest in enforcing the law free from estoppel. Id. at 60-61, 104 S.Ct. at 2224. The Ninth Circuit has said estoppel may be applied against the government when it acts in its sovereign or proprietary capacity, though courts may be more reluctant to estop the government for its sovereign activities. United States v. Lazy FC Ranch, 481 F.2d 985, 989 (9th Cir.1973). However, the Supreme Court has alerted the judiciary that equitable estoppel against the government is an extraordinary remedy. See Office of Personnel Management v. Richmond, 496 U.S. 414, 421-22, 110 S.Ct. 2465, 2469-70, 110 L.Ed.2d 387 (1990) (though the Supreme Court has left open the possibility of estopping the government, it has yet to uphold a decision which estops the government).
 
 
 35
 To assert equitable estoppel against the government, the party seeking relief must show the government exhibited affirmative misconduct. Penny v. Giuffrida, 897 F.2d 1543, 1546 (10th Cir.1990). Affirmative misconduct means an affirmative act of misrepresentation or concealment of a material fact. United States v. Ruby Co., 588 F.2d 697, 703-04 (9th Cir.1978) (citations omitted), cert. denied, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979). Mere negligence, delay, inaction, or failure to follow agency guidelines does not constitute affirmative misconduct. Fano v. O'Neill, 806 F.2d 1262, 1265 (5th Cir.1987).
 
 
 36
 We see no misrepresentation or concealment in this case. In its initial funding letter, the FAA indicated funding was conditioned upon factors ultimately left unsatisfied. We therefore conclude petitioners have failed to meet their burden of proof.
 
 IV.
 
 37
 In late 1992, Leonard Griggs, FAA's Assistant Administrator for Airports, and Thomas Richards, the FAA Administrator, informed Denver Mayor Wellington Webb of their interest in heading the Denver Aviation Department. In November 1992, Mr. Griggs recused himself from all matters involving DIA. Petitioners now allege Mr. Griggs's and Mr. Richards's actions created conflicts of interest or the appearance of impropriety because of their integral involvement in the Front Range and DIA projects and their ability to influence which airport would receive the cargo business. Petitioners insinuate the FAA made its decision to withdraw from the Front Range expansion after the presidential election with the knowledge Mr. Griggs and Mr. Richards would be seeking employment. Petitioners claim even though the FAA recognized this conflict, the agency failed to resolve it. As a result of this alleged impropriety, petitioners urge us to nullify the reversal order and reinstate the ROD.
 
 
 38
 The government specifically denies any impropriety, but argues petitioners' failure to raise the conflict claim before the agency precludes this court from hearing it now. The Federal Aviation Act proscribes judicial review of an order where objections were not first presented to the "Board or Secretary of Transportation" unless "reasonable grounds" excuse the failure to appeal to the agency. 49 U.S.C. app. Sec. 1486(e). The application of the exhaustion doctrine is a matter of the court's discretion. Park County Resource Council, Inc. v. United States Dep't of Agric., 817 F.2d 609, 619 (10th Cir.1987) (citation omitted).
 
 
 39
 Even if we were inclined to exercise our discretion, the circumstances of this case militate against it. Meaningful review is not possible because we have no factual record before us. Moreover, we cannot presume the agency would not have provided petitioners with an adequate remedy had the issue been raised before it. Accordingly, we choose not to deal with this issue.
 
 
 40
 AFFIRMED.
 
 
 
 *
 Honorable H. Dale Cook, Senior Judge for the United States District Court for the Northern District of Oklahoma, sitting by designation
 
 
 [1]
 Only one carrier, United Parcel Service, entered a use agreement with the Airport Authority. This occurred in September 1992